# SUPREME COURT OF NOVA SCOTIA

**Citation:** *Trout Point Lodge Ltd. v. Handshoe*, 2014 NSSC 62

**Date:** 2014-02-14
**Docket:** Halifax No. 411345
**Registry:** Halifax

**Between:**

Trout Point Lodge Limited, a Nova Scotia Limited Company,
Charles Leary and Vaughn Perret

Applicants

v.

Douglas Handshoe

Respondent

## DECISION

| | |
|---|---|
| **Judge:** | The Honourable Justice Kevin Coady |
| **Heard:** | December 17 and 18, 2013 in Halifax, Nova Scotia |
| **Written Decision:** | February 14, 2014 |
| **Counsel:** | Applicants: Trout Point Lodge, self-represented<br>Charles Leary, self-represented<br>Vaughn Perret, self-represented<br><br>Respondent: Douglas Handshoe, not appearing |

**By the Court:**

[1]     This is an application for an assessment of damages pursuant to *Civil Procedure Rule* 70.04. The applicants requested damages are rooted in defamation, copyright infringement and misappropriation of personality. An Amended Statement of Claim was served on Mr. Handshoe at his address in Wiggins, Mississippi. Instead of filing a defence Mr. Handshoe filed a Demand for Notice pursuant to *Civil Procedure Rule* 4.06 which states as follows:

> A defendant who does not have a defence to an action, or does not choose to defend an action, may demand notice of all steps in the proceeding.

[2]     The filing of this notice by Mr. Handshoe triggered *Civil Procedure Rule* 31.12(4) which states:

> A party who does not file a notice of defence when required is taken to have admitted, for the purposes of the action, the claims made against the party, and the party making the claim may move for judgment under Rule 8 - Default Judgment.

[3]     *Civil Procedure Rule* 8.03 states as follows:

> A judge may grant default judgment in any action on any claim, if the party against whom judgment is sought is notified in accordance with Rule 31- Notice, the time for filing a defence is expired, and no defence is filed.

Justice Moir of this Court case managed this file prior to the assessment of damages. In correspondence to the parties dated October 25, 2013, Justice Moir stated as follows:

> My order of September was made on the assumption that Mr. Handshoe wanted to defend the converted action, as he had defended the application. Instead, he chose not to defend and to file a demand for notice, which is his right. Subject only to the issue of attornment, Rules 31.12(4) and 8.03 are in operation. There is no need for a formal order of default when, instead of a defence, a demand for notice is filed.

In the same correspondence dates for the assessment of damages were scheduled.

[4] The applicants filed a motion for an assessment of damages and arranged service on Mr. Handshoe. A review of the file indicates that Mr. Handshoe acknowledged service. In fact on December 12, 2013 he attempted to file a summary judgment application and in his documents he stated he was aware of the dates set for the assessment of damages hearing. Mr. Handshoe did not participate in this motion.

[5] This proceeding represents the second round of litigation between these parties. In the first proceeding (2012 NSSC 245) these applicants obtained default judgment against Mr. Handshoe in an action filed in 2011. That action sought damages for defamation, invasion of privacy, injurious falsehood, intentional interference with contractual relations, intentional interference with economic relations, intentional infliction of emotional and mental distress and assault. An assessment of damages followed. Mr. Handshoe did not participate.

[6] The former and present actions are similar in that they are a response to Mr. Handshoe's defamatory actions conducted through the Internet. Justice Hood summarized Mr. Handshoe's activities at paragraphs 5 to 8 of the first proceeding:

> [5] The defamatory comments originated with a news story which was published in the *Times Picayune* newspaper in Louisiana about Jefferson Parish President, Aaron Broussard, being involved in a political corruption scandal. The plaintiffs were erroneously identified as being connected with Mr. Broussard in a business venture and Mr. Broussard was named in error as owning Trout Point Lodge. The allegations against him are kickback schemes, money laundering and fraud while in his office as Parish President.
>
> [6] The defamatory comments later included claims that Trout Point Lodge, Mr. Leary and Mr. Perret, had misled ACOA and that Mr. Leary committed perjury in litigation with ACOA. The defamation continued with statements that Trout Point Lodge was losing business or going bankrupt because of the investigation of Mr. Broussard and his inability to continue to support it.
>
> [7] Also, there were claims that Charles Leary and Vaughn Perret had been involved in a series of businesses which failed and are con men. The statements also contained anti-gay rhetoric and homophobic comments.
>
> [8] After the original story was retracted by the Louisiana newspaper that published it, Mr. Handshoe made statements that Mr. Leary and Mr. Perret had improperly influenced it to retract the story. He also said that Mr. Leary and Mr. Perret were improperly using the legal system by commencing the defamation action.

[7] Justice Hood also reviewed the some of Mr. Leary's evidence that addressed the impact of Mr. Handshoe's actions. I will repeat that evidence here as it arose in this application as well.

- I am seriously concerned about Slabbed hurting the Lodge's business, which Mr. Perret and I rely on as our primary source of income. In 2011, occupancy rates at Trout Point were 3% lower than in 2010. This represents a value of at least $15,000.00.

- Mr. Handshoe's Internet publications have added a great deal of stress to our lives, including with physical manifestations.

- I have also felt genuinely afraid of his published threats and of the existence of the Slabbed Nation and members of that group being in Nova Scotia. I now keep my doors locked at night, whereas previously I never feared for my safety in my own home.

- I have told my personal physicians in Spain and Nova Scotia about stress and sleeplessness related to the Handshoe publications. My physician, Dr. Fernandez-Noguera has prescribed medication to help me sleep after the Slabbed publications commenced and to help control my anxiety. I have also experienced embarrassment, humiliation, and irritability. It was hard to get through work in 2011 knowing that nearly every day a new source of embarrassment and business disruption might be published by Handshoe. I have been embarrassed that friends and acquaintances in Yarmouth might confront me about the Slabbed allegations. I can never be sure that members of the local community might secretly harbour a belief in the truth of the blog's allegations.

- Due to the publications on Slabbed and by Mr. Handshoe elsewhere on the Internet I have a very real fear that anyone performing due diligence on us as businesspeople or innkeepers will discover and believe Mr. Handshoe's publications.

- I have felt embarrassed in my local community. Mr. Perret and I have at times changed our usual shopping patterns in Yarmouth in order to avoid persons we consider friends who may have read the Slabbed publications.

- In April, 2011, at the time when Mr. Handshoe's publications about us became threatening and homophobic, I experienced tightened shoulder & neck muscles, sleeplessness, and developed a severe outbreak of fever blisters for which I had to take Zovirax, an antiviral medication. Previously, I always slept very well, never waking up early. Since April, 2011, I have experienced regular sleeplessness, particularly waking up early in the morning worrying about Slabbed and its effect on our business.

[8]   In the first assessment of damages the Court awarded the following:

>   Defamation – Trout Point Lodge – $75,000
>   Defamation – Mr. Leary – $100,000
>   Defamation – Mr. Perret – $100,000
>   Aggravated Damages – Mr. Leary – $50,000
>   Aggravated Damages – Mr. Perret – $50,000
>   Punitive Damages – Mr. Leary – $25,000
>   Punitive Damages – Mr. Perret – $25,000

In addition Justice Hood awarded $2000 in costs. The applicants have not been able to realize on any of these awards due to the exigencies of Mississippi legislation and notwithstanding applications to an appellate level.

[9]   In addition to damages Justice Hood granted an injunction against Mr. Handshoe. She states at paragraphs 105 and 106:

> [105]   Mr. Handshoe is, therefore, enjoined from dissemination, posting on the Internet, distributing or publishing in any manner whatsoever, directly or indirectly, statements or comments about Trout Point Lodge, Charles Leary and Vaughn Perret. This includes statements or comments which refer to the three plaintiffs by name, depiction or description.
>
> [106]   A mandatory injunction shall also issue requiring Douglas Handshoe to remove the defamatory comments, statements and depictions from any Internet site on which he has posted them and any links to those sites.

The evidence on this application satisfies me that Mr. Handshoe has continued to defame the applicants notwithstanding the injunction. Furthermore it is abundantly clear that Mr. Handshoe feels entirely immune from the orders of this Court. In fact it is not an overstatement to say that Mr. Handshoe "snubs his nose" at all judicial officers and institutions of Nova Scotia.

**Defamation Damages:**

[10] The evidence presented establishes that Mr. Handshoe's defamatory actions have continued unabated since Justice Hood's order. This is supported by the statement of claim which I must accept as proven. The following is but a taste of the defamation plead:

- Mr. Handshoe has continued to repeatedly publish words referring to the personal plaintiffs as "girls", "bitches", "bottom boys", "wives", "perverted" and "queer fag scum."

- Mr. Handshoe has continued to publish that the applicants were long term recipients of criminal proceeds from the Broussard criminal scheme.

- Trout Point Lodge was described by Mr. Handshoe as a shell company used for the purposes of a criminal conspiracy including money laundering.

- The applicants were part of an international criminal conspiracy designed to silence the investigation of their own criminal wrongdoing. Also that their Nova Scotia legal proceedings were criminally motivated and fraudulent.

- The plaintiffs and Mr. Boussard illegally influenced the presiding Justice of the Supreme Court in Yarmouth to deprive Mr. Handshoe of his civil rights and due process.

- Mr. Handshoe published that the applicants intentionally misled Justice Hood and therefore committed perjury.

- The applicants were members of a Louisiana company involved in criminal activities alleged by American prosecutors.

- Mr. Handshoe republished the following: "I'll add here, in case it is not self-evident, that I built complete dossiers on all the players in this social group and I intend through time to roll out each and every one in excruciating detail as long as the lawsuit in Canada is an outstanding issue for Slabbed. The reason for this is that this band of gay men act as a unit that will also scatter like cockroaches when the heat is applied."

- Mr. Handshoe created a video that was published on *YouTube*. The content created the implication that the applicants were part of the Aaron Boussard criminal scandal, were involved in criminal activities with Broussard such as those alleged to have been conducted using Nova Scotia Enterprises, LLC, and that Trout Point Lodge was recipient of criminal monies and a place of criminal activity. Handshoe referred to and pictured Broussard as the "Goatherder in Chief" and the Plaintiff's as "the goatherders."

The evidence on this application satisfies me that Mr. Handshoe was not deterred by Justice Hood's decision. There is little difference between his actions pre and post January 31, 2012 when the first assessment of damages was initiated.

[11] The actions and words of Mr. Handshoe since the first application are clearly defamatory. Furthermore they have no relationship to fact or truth. They amount to nothing more than a misguided attempt to destroy Mr. Leary, Mr. Perret and Trout Point Lodge.

[12]  In *Grant v. Torstar Corp.*, [2009] 3 S.C.R. 640 the Supreme Court of Canada discussed damages for defamation as follows at paragraph 28 and 29:

> [28]  A plaintiff in a defamation action is required to prove three things to obtain judgment and an award of damages: (1) that the impugned words were defamatory, in the sense that they would tend to lower the plaintiff's reputation in the eyes of a reasonable person; (2) that the words in fact referred to the plaintiff; and (3) that the words were published, meaning that they were communicated to at least one person other than the plaintiff. If these elements are established on a balance of probabilities, falsity and damage are presumed... The plaintiff is not required to show that the defendant intended to do harm, or even that the defendant was careless. The tort is thus one of strict liability.
>
> [29]  If the plaintiff proves the required elements, the onus then shifts to the defendant to advance a defence in order to escape liability.

[13]  I am satisfied that the applicants are entitled to additional damages as a result of Mr. Handshoe's defamation. In *Mina Mar Group Inc. v. Devine*, 2001 ONSC 1172 the Court discussed general damages for Internet defamation at paragraphs 10 and 11:

> [10]  In *Barrick Gold Corp. v. Lopehandi* 2004 CanLII 12938 (ON CA), (2004), 71 O.R. (3d) 416 (C.A.), the defendant used postings on Internet sites to disparage the business practices of and to defame the plaintiff corporation by among other things accusing it of a long list of criminal misconduct. The postings were numerous and were part of a prolonged campaign on the part of the defendant designed to embarrass the plaintiff and injure its reputation. The Court of Appeal awarded general damages of $75,000, punitive damages of $50,000, and a permanent injunction. The *Barrick* case is the leading case about damages in Internet defamation cases and about whether and when the remedy of injunctive relief should be available against defendants who do not reside in Ontario.
>
> [11]  The factors to consider in determining general damages include: (a) the plaintiff's position and standing; (b) the nature and seriousness of the defamatory statements; (c) the mode and extent of the publication; (d) the absence or refusal to retract the libel or to apologize for it; (e) the

> conduct and motive of the defendant; (f) the presence of aggravating or mitigating circumstances: *Barrick Gold Corp. v. Lopehandi, supra* at para. 29; *Hill v. Church of Scientology of Toronto*, 1995 CanLII 59 (SCC), [1995] 2 S.C.R. 1130 at p. 1203;

I am satisfied that these factors have been established by the applicants, both individual and corporate. Justice Hood was satisfied that at law a corporate defendant can be defamed (paragraphs 81-83). She awarded Trout Point Lodge $75,000 in general damages. I award Trout Point Lodge a further $35,000 in general damages.

[14] I am also satisfied that Mr. Leary and Mr. Perret are entitled to additional damages. Justice Hood awarded each $100,000 in general damages, $50,000 in aggravated damages and $25,000 in punitive damages. The applicants have not realized on these awards. I am awarding Mr. Leary and Mr. Perret each an additional $50,000 in general damages.

[15] The individual applicants seek additional aggravated damages. In *Hill v. Church of Scientology of Toronto*, [1995] 2 S.C.R. 1130 Cory J. discussed aggravated damages at paragraph 188 and 189:

> 188. Aggravated damages may be awarded in circumstances where the defendants' conduct has been particularly high-handed or oppressive, thereby increasing the plaintiff's humiliation and anxiety arising from the libellous statement. The nature of these damages was aptly described by Robins J.A. in *Walker v. CFTO Ltd., supra*, in these words at p. 111:

> Where the defendant is guilty of insulting, high-handed, spiteful, malicious or oppressive conduct which increases the mental distress -- the humiliation, indignation, anxiety, grief, fear and the like -- suffered by the plaintiff as a result of being defamed, the plaintiff may be entitled to what has come to be known as "aggravated damages".
>
> 189. These damages take into account the additional harm caused to the plaintiff's feelings by the defendant's outrageous and malicious conduct. Like general or special damages, they are compensatory in nature. Their assessment requires consideration by the jury of the entire conduct of the defendant prior to the publication of the libel and continuing through to the conclusion of the trial. They represent the expression of natural indignation of right-thinking people arising from the malicious conduct of the defendant.

I am amply satisfied that Mr. Handshoe's conduct meets the test for additional aggravated damages. I award Mr. Leary and Mr. Perret each $30,000 in aggravated damages.

[16] The individual applicants seek additional punitive damages. Cory J. discussed when to apply these damages at paragraph 196 of the *Hill* decision:

> Punitive damages may be awarded in situations where the defendant's misconduct is so malicious, oppressive and high-handed that it offends the court's sense of decency. Punitive damages bear no relation to what the plaintiff should receive by way of compensation. Their aim is not to compensate the plaintiff, but rather to punish the defendant. It is the means by which the jury or judge expresses its outrage at the egregious conduct of the defendant. They are in the nature of a fine which is meant to act as a deterrent to the defendant and to others from acting in this manner. It is important to emphasize that punitive damages should only be awarded in those circumstances where the combined award of general and aggravated damages would be insufficient to achieve the goal of punishment and deterrence.

I am satisfied that Mr. Handshoe's conduct meets this criteria. I award Mr. Leary and Mr. Perret each an additional $25,000 in punitive damages.

## Copyright Damages:

[17]　The individual applicants seek damages for copyright infringement in relation to four (4) photographs disseminated on the Internet by Mr. Handshoe for commercial purposes. These infringements were plead in the Amended Statement of Claim, and as Mr. Handshoe has not filed a defence, these infringements are deemed admitted. These applicants have elected to request statutory damages instead of general damages.

[18]　Section 38.1(1) of the *Copyright Act,* R.S.C. 1985, c. C-42 allows for the above referenced election. It states as follows:

> Subject to this section, a copyright owner may elect, at any time before final judgment is rendered, to recover, instead of damages and profits referred to in subsection 35(1), an award of statutory damages for which any one infringer is liable individually, or for which any two or more infringers are liable jointly and severally,
> (*a*) in a sum of not less than $500 and not more than $20,000 that the court considers just, with respect to all infringements involved in the proceedings for each work or other subject-matter, if the infringements are for commercial purposes.

There is ample evidence that Mr. Handshoe disseminated the four (4) photographs for commercial purposes. His principle activity is blogging and his materials attract many followers. I am satisfied that "Slabbed" is a commercial operation.

The evidence as a whole establishes that Mr. Handshoe was using these photographs to destroy the business interests of Trout Point Lodge, Charles Leary and Vaughn Perret and in doing so enhance "Slabbed's" credibility as an investigative organization. In addition the applicants plead at paragraph 8 that "Handshoe uses his website as a commercial enterprise." On the basis of *E. Sands and Associates v. Dextras Engineering & Construction Ltd.*, 2009 BSSC 42 I must accept this assertion as proven.

[19] Section 38.1(5) of the *Act* lists the factors to consider when a plaintiff elects to recover statutory damages. It states:

> In exercising its discretion under subsections (1) to (4), the court shall consider all relevant factors, including
> (*a*) the good faith or bad faith of the defendant;
> (*b*) the conduct of the parties before and during the proceedings;
> (*c*) the need to deter other infringements of the copyright in question.

[20] Section 38.1(7) allows the awarding of exemplary and punitive damages in addition to statutory damages. It states:

> An election under subsection (1) does not affect any right that the copyright owner may have to exemplary and punitive damages.

[21] The first photo depicts Mr. Leary and Mr. Perret. It initially appeared in the website of an organization called "Ashoka." On that website the individual applicants were described as change makers and social entrepreneurs. Mr.

Handshoe placed this picture on his blog on five (5) occasions. He has never removed it and it appears alongside defamatory script. I have in evidence a copyright assignment dated December 13, 2012 between "Ashoka" and Charles Leary.

[22] The second photo depicts Trout Point Lodge and was taken by Mr. Perret. It was used extensively to promote Trout Point Lodge. Mr. Handshoe put it on his blog alongside defamatory script. Mr. Perret never relinquished his interest in this photo and Mr. Handshoe has not removed it from his blog.

[23] The third photo depicts Mr. Leary, Mr. Perret and their associate Mr. Abel. It was taken by one Marilyn Smulders and was extensively used to promote Trout Point Lodge. Mr. Handshoe placed it on his blog on seven (7) occasions alongside defamatory script. I have in evidence an Assignment of Copyright dated August 21, 2013 between Marilyn Smulders and Trout Point Lodge. Mr. Handshoe has not removed this image from his blog.

[24] The fourth photo depicts Mr. Leary and Mr. Perret standing in front of Trout Point Lodge with their dog. The *Toronto Star* took this photograph for a story they were writing on Trout Point Lodge. It was placed on their website where it was accessed by Mr. Handshoe. It was used by Mr. Handshoe alongside defamatory

script. I have in evidence a Certificate of Registration Copyright dated July 8, 2013 in the name of Trout Point Lodge Ltd.

[25] The evidence satisfies me that these infringements occurred between the time of Justice Hood's decision and the start of this application. The evidence also satisfies me that all of the photographs were the property of the applicants when utilized by Mr. Handshoe. I am also satisfied that the individual applicants complained to Mr. Handshoe who ignored their concerns and their rights in the photographs. It should not be forgotten that these infringements offended the 2012 injunction issued by Justice Hood. Their misuse amounted to an ongoing campaign to damage, harass and embarrass the applicants.

[26] In *Microsoft Corporation v. PC Village Co. Ltd.*, 2009 FC 401 the Federal Court awarded generous statutory damages based on bad faith and the need for deterrence. Justice Harrington state at paragraph 39:

> [39] I conclude that the amount of statutory damages must reflect not only the bad faith of the Defendants and their disregard for the rights of the Plaintiff. It must also deter the Defendants from continuing their course of action. In my view, the amount for statutory copyright damages must be sufficiently high to serve a salutary message and deter future infringements on the part of the named Defendants and other parties.

The Court also addressed exemplary and punitive damages at paragraph 42:

> [42] The law with respect to the award of punitive and exemplary damages was summarized by Justice Boyd in *Louis Vuitton Malletier S.A. v.*

*486353 B.C. Ltd.*, 2008 BCSC 799 (CanLII), 2008 BCSC 799 at paras. 84 to 86. After reviewing general principles Justice Boyd stated:

> [86]    Punitive and exemplary damages have been awarded in cases of trade-mark and copyright infringement, where, for example, the conduct of the defendants was "outrageous" or "highly reprehensible", or where the defendant's actions constituted a callous disregard for the rights of the plaintiff or for injunctions granted by the Court. Similarly, in determining whether punitive and exemplary damages ought to be awarded, the Court will consider whether the defendant has little regard for the legal process, thus requiring the plaintiff to expend additional time and money in enforcing its rights.

The Plaintiff submits that it is appropriate to award punitive damages of at least $50,000. Given the conduct of the Defendants it is appropriate that that conduct be condemned by means of a significant punitive damage award.

I find that Mr. Handshoe's conduct towards the applicants over the past few years amounts to "outrageous and highly reprehensible" conduct. The four (4) infringements herein must be viewed on top of the defamation that continues to this date in the face of Justice Hood's injunction. This is a case for generous statutory damages as well as punitive damages.

[27]    I award the following statutory damages:

- In relation to the first photograph (Ashoka), I award Charles Leary $20,000.

- In relation to the second photograph (the Lodge), I award Mr. Perret $20,000.

- In relation to the third photograph (Smulders), I award Trout Point Lodge Ltd. $20,000.

- In relation to the fourth photograph, I award Trout Point Lodge Ltd. $20,000.

[28] In addition to these statutory damages I award the applicants punitive damages of $100,000.

## **Wrongful Appropriation of Personality Damages:**

[29] There are limited cases where this tort has been discussed. In *Joseph v. Daniels*, 1986 CanLII 1106 (BCSC) Wallace J. referenced the decision of Estey J.A. in *Krouse v. Chrysler Canada Ltd.*, [1974] 1 O.R. (2d) 225 wherein he stated at page 238:

> I therefore, conclude from the foregoing examination of the authorities in the several fields of tort related to the allegations made herein that the common law does contemplate a concept in the law of torts which may be broadly classified as an appropriation of one's personality.

Wallace J. also referenced the decision of Henry J. in *Athans v. Canadian Adventure Camps Ltd.*, (1977), 17 O.R. (2d) 425 at page 434:

> I turn now to the second head of claim, namely, wrongful appropriation of the plaintiff's personality. I say at once that, on the basis of recent authority, it is clear that Mr. Athans has a proprietary right in the exclusive marketing for gain of his personality, image and name, and that law entitles him to protect that right, if it is invaded.

[30] Wallace J. discussed the element of such a claim at paragraph 14:

> [14] From my review of the authorities I have concluded that it is the unauthorized use of a name or likeness of a person as a symbol of his identity that constitutes the essential element of the cause of action. The cause of action is proprietary in nature and the interest protected is that of the individual in the exclusive use of his identity insofar as it is represented by his name, reputation, likeness or other value. For the defendant to found liable, he must be taking advantage of the name,

> reputation, likeness or some other component of the plaintiff's
> individuality or personality which the viewer associates or identifies with
> the plaintiff.

These authorities establish that this tort may be the foundation for a viable claim. In *Joseph v. Daniels, supra,* the plaintiff was unsuccessful because the specific image did not identify him.

[31]   This tort was extensively discussed in *Poirier v. Wal-Mart Canada Corporation,* 2006 BCSC 1138. Arnold-Bailey J. reviewed the caselaw where damages were denied. A principle that emerges is that compensation for the appropriation of one's personality should be used sparingly (*Racine v. C.J.R.C. Radio Capitale Ltee,* (1977) 17 O.R. (2d) 370). Damages in most successful actions were nominal.

[32]   After a review of the authorities I decline to award damages for this tort. If this was a stand alone claim I might be inclined to decide otherwise. I am of the view that the damages for copyright infringement adequately address the conduct of Mr. Handshoe.

Coady, J.