Exhibit 1

2011                                                              Yar. No. 353654

IN THE SUPREME COURT OF NOVA SCOTIA

BETWEEN:

**Trout Point Lodge, Limited,** *a Nova Scotia Limited*
*Company*, **Vaughn Perret**, and **Charles Leary**
**Plaintiffs**

– and –

**Doug Handshoe** and **"Jane Doe"** (annemarieboudreaux@yahoo.com)
**Defendants**

**1st Amended Notice of Action**
( Amended September 1, 2011 )

To:  Doug Handshoe and "Jane Doe" (annemarieboudreaux@yahoo.com)

**Action has been started against you**

The plaintiffs take action against you.

The plaintiffs started the action by filing this notice with the court on the date certified by the prothonotary.

The plaintiffs claim the relief described in the attached statement of claim.  The claim is based on claims of defamation, intentional infliction of emotional & mental harm, and assault based on your publications on the slabbed Internet blog.

**Deadline for defending the action**

To defend the action, you or your counsel must file a notice of defence with the court no more than the following number of days after the day this notice of action is delivered to you:

• 15 days if delivery is made in Nova Scotia

• 30 days if delivery is made elsewhere in Canada

• 45 days if delivery is made anywhere else.

**Judgment against you if you do not defend**

The court may grant an order for the relief claimed without further notice, unless you file the notice of defence before the deadline.

**You may demand notice of steps in the action**

If you do not have a defence to the claim or you do not choose to defend it you may, if you wish to have further notice, file a demand for notice.

If you file a demand for notice, the plaintiff must notify you before obtaining an order for the relief claimed and, unless the court orders otherwise, you will be entitled to notice of each other step in the action.

**Rule 57 - Action for Damages Under $100,000**

Civil Procedure Rule 57 limits pretrial and trial procedures in a defended action so it will be more economical.  The Rule applies if the plaintiff states the action is within the Rule.

Otherwise, the Rule does not apply, except as a possible basis for costs against the plaintiff.

This action is not within Rule 57.

**Filing and delivering documents**

Any documents you file with the court must be filed at the office of the prothonotary, Supreme

Court of Nova Scotia, Yarmouth Justice Centre, 164 Main St., Yarmouth, NS B5A 1C2
CANADA (telephone # 902-742-5505).

When you file a document you must immediately deliver a copy of it to each other party entitled
to notice, unless the document is part of an ex parte motion, the parties agree delivery is not
required, or a judge orders it is not required.

**Contact information**

The plaintiff designates the following address:

P.O. Box 456

Kemptville, Nova Scotia B0W 1Y0

Documents delivered to this address are considered received by the plaintiff on delivery. Further
contact information is available from the prothonotary.

**Proposed place of trial**

The plaintiff proposes that, if you defend this action, the trial will be held in Yarmouth, Nova
Scotia.

**Signature**

Signed September ___1___, 2011

Signature of plaintiff _____

Print name:    Charles L. Leary    Vaughn J. Perret

**Prothonotary's certificate**

I certify that this notice of action, including the attached statement of claim, was filed with the

court on ~~September 1~~ , 20 11 .

Prothonotary

Elaine L. d'Entremont
Prothonotary

2011                                                                    Yar. No. 353654

IN THE SUPREME COURT OF NOVA SCOTIA

BETWEEN:

**Trout Point Lodge, Limited,** *a Nova Scotia Limited*
*Company,* **Vaughn Perret** and **Charles Leary**
**Plaintiffs**

- and -

**Doug Handshoe and "Jane Doe"** (annemarieboudreaux@yahoo.com)
**Defendants**

## <u>1ST AMENDED STATEMENT OF CLAIM</u>

1. The Plaintiff Trout Point Lodge is a Nova Scotia Limited Company with its registered office
and residence in Kemptville, Yarmouth County, Nova Scotia. It was formed and registered with
the Nova Scotia Registry of Joint Stocks in December, 1998. Its officers are Vaughn Perret and
Charles Leary. Its principal owners are Daniel Abel, Vaughn Perret, and Charles Leary.

2. The company operates a Nova Scotia-licensed fixed-roof accommodation and restaurant that
has an established international & Canadian reputation as one of the premiere boutique hotels
and practitioners of sustainable tourism in the world.

3. High ethical standards are essential to the corporate Plaintiff's reputation.

4. Plaintiff Charles Leary resides in East Kemptville, Nova Scotia. He is a business person and
former professor of history.

5. Plaintiff Vaughn Perret resides in East Kemptville, Nova Scotia. He is a business person and
holds a Juris Doctorate from Cornell University.

6. <u>Both are closely associated and identified with their businesses Trout Point Lodge and Cerro</u>

Coyote, S.A.

7.  The Defendant Doug Handshoe is a resident of the State of Mississippi. He is a Certified Public Accountant. At all relevant times, he operated a web log, or blog, published on the Internet at slabbed.wordpress.com, hereafter "slabbed." He also owns the domain slabbed.org and made publications at that url.

8.  The domain slabbed.org was registered to Slabbed New Media, LLC, a company of which Defendant Handshoe is the sole member, first registered with the Mississippi Secretary of State on April 11, 2011.

9.  The second made defendant is the person registered with wordpress.com using the email address annemarieboudreaux@yahoo.com (hereafter Boudreaux). This person published on slabbed using the moniker "unslabbed."

10. The plaintiff says that the defendant Handshoe published under the moniker of Sop81_1 as well as other user names. The Plaintiff says that until proved otherwise, the defendant is the author, publisher, and editor of all posts and comments appearing on the slabbed blog, with the exception of the material written by "unslabbed" identified below.

11. In the alternative, the Plaintiff says that defendant Handshoe controlled all publications made on the web site and had the ability to choose to publish or not to publish comments on the blog's postings. The defendant approved all publications made on the blog.

12. As background, it is important to understand that in January, 2010, New Orleans, Louisiana, area news media misidentified the plaintiffs as being involved in a political corruption scandal involving then Jefferson Parish President Aaron Broussard. In this coverage, Trout Point Lodge was mistakenly identified as being Mr. Broussard's business and/or property, and involved in alleged wrongdoing including fraud, kickback schemes, and money laundering. WVUE Television was the first media organization to identify Trout Point Lodge with Broussard. Another prominent news organization, the New Orleans Time-Picayune newspaper, published 2 retractions correcting previous news stories in January, 2010 and April, 2011.

13. According to slabbed, at all relevant times the blog had a steadily increasing viewership, surpassing 90,000 views per month in March, 2011.

14. The Plaintiffs claim against the Defendants for defamation, invasion of privacy & conspiracy to invade privacy, injurious falsehood, intentional interference with contractual relations, intentional interference with economic relations, intentional infliction of emotional & mental

distress, and assault.

### 1ST CAUSE OF ACTION: DEFAMATION

15. The Plaintiff says it relies on the privileges and rights of the Nova Scotia Defamation Act, as amended.

16. The defendants used slabbed to publish on the Internet, and encouraged others to publish, words that referred to Charles Leary, Vaughn Perret, and Trout Point Lodge by name, and/or by inference.

17. The defendants' defamatory publications were republished and linked to on third party web sites.

18. These publications were directly defamatory and were also defamatory by both true and false innuendo in that they would tend to lower the opinion or estimation of the plaintiffs in the eyes of others who read the defamatory publications as a series, or alternatively, in parts.

19. The Plaintiffs say that there are at least 4 defamatory innuendoes and stings active in the slabbed publications.

20. First, there is the identifying and linking of the plaintiffs with the Jefferson Parish Political Corruption Scandal. The sting here is that Trout Point Lodge and its owners were somehow involved in corruption, fraud, money laundering, and "pay to play" schemes involving Jefferson Parish President Aaron Broussard and his administration. This defamatory sting was first published by New Orleans area news media including WVUE Television and the Times-Picayune newspaper, and was picked up, elaborated, and republished by the defendants. The Time-Picayune, for one, has retracted its publications.

21. Second, there is the clear imputation that the plaintiffs misled investors and court officials in litigation with the Atlantic Canada Opportunities Agency (ACOA). The sting here is that Charles Leary perjured himself, investors were misled, businesses nefariously changed ownership, and that the ACOA litigation is ongoing, with the plaintiffs loosing every step of the way.

22. Third, there is the imputation that the Trout Point Lodge business is actively failing, near bankruptcy, having once relied on the good graces of Aaron Broussard. There is also the related imputation that the personal plaintiffs have had a series of failed businesses that used other people's money, creating a pattern. The sting is that the plaintiffs' 13-year old business is on the verge of bankruptcy, that the plaintiffs will take the money and run, and that the plaintiffs are either con artists or have no business acumen whatsoever.

23. <u>Finally, there is the unabashed anti-gay, anti-homosexual rhetoric and rants of the defendants.</u>
<u>This rhetoric is used to amplify and support the three other stings listed above. It enters every</u>
<u>aspect of the defendants' multiple publications, in an obvious attempt to speak to those who</u>
<u>harbor bigotry and hatred towards gays, like the defendants. Saying anti-gay things supports and</u>
<u>shores up all the other defamatory imputations.</u>

24. The defendants <u>also</u> encouraged others to write anti-gay and homophobic rhetoric &
innuendo. <u>At all relevant times, slabbed contained comments based on Leary and Perret's</u>
<u>perceived sexual orientation. Those comments were meant to be derogatory and insulting.</u>
<u>These slabbed publications engendered discrimination and hatred, and were intended by the</u>
<u>defendants to do so.</u> As part of this rhetoric, the defendant Handshoe's publications referred to
plaintiffs Leary, Perret and their business partner as "girls," <u>"blow buddies," "queer fag scum,"</u>
and "bitches," published more than one reference to a gay-themed movie, and posted video clips
of movies and music videos commonly associated with gay stereotypes.

25. The Plaintiffs say that when references to an individual's sexual orientation are made in a
derogatory way in the context of defamatory publications, those references are themselves
defamatory and an invasion of privacy. The defendant published in such a way as to encourage
hatred and contempt for gay individuals, and to encourage negative stereotypes.

26. The defendants' blog posting publications were downloaded and read in Nova Scotia by the
personal plaintiffs and others, including but not limited to Trout Point Lodge employees, persons
at the Stewart McKelvey law firm in Halifax, <u>persons in the employ of Nova Scotia-based Frank</u>
<u>magazine</u>, and guests of Trout Point Lodge living in Nova Scotia.

27. In blog posts published in August, 2011, the defendant also admitted to having a Nova Scotia
audience and to receiving communications from persons in Nova Scotia.

28. The plaintiffs say that starting on February 6, 2010, the personas known as "Telemachus" and
"unslabbed" (Boudreaux) revived the issues raised in previous defamatory publications by media
organizations, including by the Times-Picayune and WVUE Television.  Immediately after
hyperlinking to a letter from Trout Point Lodge published online at the Internet home of the
Times-Picayune, nola.com, Telemachus stated as a matter of fact that "The TP [Times-Picayune]
wrote a correction that made it seem like everything reported about Nova Scotia was false. Well
it wasn't." This statement is defamatory in that it referred to the Plaintiffs in the context of an
implied coverup of the truth about the Broussard scandal by media organizations, and  implicated

the plaintiffs' involvement in a political corruption scandal.

29. The Plaintiffs say that in general references on the slabbed blog to "Nova Scotia" or Aaron Broussard's Nova Scotia properties within the context of the "Jefferson Parish political corruption scandal" include an implicit reference to the Plaintiffs, particularly given Telemachus' public repudiation of the Times-Picayune retraction. Sop81_1 (Handshoe), Telemachus, and unslabbed (Boudreaux) continued the defamatory innuendo that Trout Point Lodge was Aaron Broussard's property and/or business, involved in shady dealings, and the front for a criminal enterprise.

30. Defendant Handshoe defended (and continues to defend) all of his publications and stated on August 30, 2011, that he "cannot lie." He also publicly stated publications on his blog were based on "evidence" gained in the process of a "search for the truth." The Plaintiffs say that all the defendants' publications were statements of fact and not of opinion, and that they would tend to lower the esteem held for the plaintiffs in the eyes of other reasonable people.

31. On March 8, 2010, in a "comment" post, unslabbed (Boudreaux) made reference to WVUE Television and its reporter Val Bracy. She stated that WVUE/Louisiana Media was being sued by the Plaintiff, which at that time was not true. WVUE had just been served with the plaintiff's Notice of Intended Action in an attempt to get a retraction.

32. "unslabbed" continued in the same publication to use words:

--mocking of the Plaintiffs

--implying that any investors the Plaintiffs might have are illegitimate or suspicious

--stating that the plaintiffs had filed a frivolous lawsuit

--stating that the Plaintiffs had knowingly sued an incorrect party

--stating that the plaintiffs had illegitimately "silenced" the free press

--implying that the plaintiffs feared investigation by the press


33. On November 16, 2010, Telemachus revived the subject of "Nova Scotia," which by that time was a code word known to slabbed readers by innuendo to reference the Plaintiffs and their alleged connections to Aaron Broussard, in the context of a federal criminal investigation.

34. On February 16, 2011, Telemachus and Defendant Handshoe republished the entirety of a defamatory January 10, 2010, Times-Picayune article that had been removed from publication and/or retracted by that newspaper. The "Mystery on the shores of Nova Scotia may be

uncovered by ethics board" article written by Richard Rainey contained defamatory innuendo about the plaintiffs, made false statements of fact, and had little if any journalistic value. The article also linked the Broussard scandal to investigations of government deals involving waste disposal contracts, particularly with a company called River Birch. Telemachus was, in addition to making a publication referring to the Plaintiffs that would tend to lower their esteem in the eyes of ordinary people,  also reviving in February, 2011, the whole gamut of defamatory implications and innuendo first appearing in January, 2010, which the Plaintiffs had worked so hard to have retracted by established media organizations.

35. Telemachus as published by Defendant Handshoe then continued to draw Charles Leary, Vaughn Perret, and Daniel Abel personally into the defamatory context, mentioning them and their business entities by name.

36. The stings of the defamation had by February, 2011, actually increased over January, 2010, as Mr. Broussard was then publicly known to be the subject of a "target letter" from the Federal Bureau of Investigation, and at least one federal indictment involving River Birch had been handed down.

37. Telemachus concluded his post by suggesting that the Plaintiffs belonged in the proverbial "woodpile" along with Broussard and others publicly implicated in the scandal. It is notable given the homophobic rhetoric of slabbed's publications that a bundle of sticks intended for burning is a "faggot."

38. On February 20, 2011, unslabbed (Boudreaux) imputed that subpoenas issued to Jefferson Parish government officials in the federal investigation would result in Grand Jury testimony regarding topics such as Aaron Broussard's Nova Scotia properties (by imputation, based on previous impressions created by the Defendants, including the Plaintiffs) in connection with charges of wire fraud, payroll fraud, and conspiracy.

39. On February 21, 2011, Telemachus again referred to the Plaintiffs in the context of the Broussard scandal and published suspicions about the Plaintiffs' connections to persons— including public officials-- allegedly implicated in the River Birch scandal and the federal investigation.

40. On February 24, 2011 unslabbed (Boudreaux) implicated the plaintiffs in Nova Scotia as being the ultimate recipient of millions of dollars in monies paid by Jefferson Parish, while under Broussard's direction, to government waste disposal contractors.

41. On February 25, 2011, Telemachus <u>as published by Handshoe</u> brought up the January 6, 2010 television broadcasts of WVUE. He/she implied that WVUE's journalistic investigation and broadcasts, which referred to the Plaintiffs, resulted in Aaron Broussard's resignation, implying in turn that there was something sinister or mysterious about Broussard's Nova Scotia properties, including, incorrectly, the Plaintiffs' property.

42. On March 2, 2011, Telemachus <u>as published by Defendant Handshoe</u> again raised WVUE's broadcasts of the interview by reporter Val Bracy of Mr. Broussard, referred to his Nova Scotia properties, and implied that he resigned due to the broadcasts, the proverbial smoking gun.

43. In April, 2011 the defamatory publications of the defendants increased in tenor, detail, and frequency.

44. Defendant Handshoe as user Sop81_1 published the following on slabbed.wordpress.com on April 26, 2011 in a post entitled "Slabbed takes a look at the Trout Point business venture: Let's start at the end and work back":

45. "In researching this story what I have found is a pattern of Leary, Abel and the girls being first class bitches and I think it is safe to assume based upon the retractions they made the Times Picayune and its corporate parent their bitch in this fiasco because Rainey was onto something big, albeit a bit dated in the fleecing of several local individuals that were marketed and sold ownership in the Trout Point by Aaron Broussard, who had close personal and business ties to Abel, Leary and the girls." Richard Rainey was a reporter for the Times-Picayune newspaper.

46. The plaintiffs say that stating publicly that Leary demonstrates a pattern of being a "first class bitch" would <u>tend to lower the esteem reasonable persons</u> hold for the personal plaintiff. <u>The Plaintiffs further say that Plaintiff Perret was identified by the Defendants as one of "the girls," and was therefore similarly being referred to.</u>

47. Stating that the plaintiffs were involved in a "fiasco," "something big," which was the "fleecing of several local individuals" is defamatory. To fleece a person is equivalent to committing fraud and/or extortion, a crime.

48. The defendant published in the same post: "Leary, Perret and Abel were trying to use the Canadian Libel laws to strong-arm the Picayune and their parent Advance Publications;" and "Leary and the gang thought they buried the story."

49. Stating that the plaintiffs used Canadian law and the Nova Scotia judicial system for an ulterior or improper purpose is defamatory. Stating that the plaintiffs worked against freedom of

the press, "strong-arming" a prominent daily newspaper, the Times-Picayune, is defamatory.

50. In the same blog post of April 26, 2011 at the url
http://slabbed.wordpress.com/2011/04/26/slabbed- takes-a-look-at-the-trout-point-business-
venture-lets-start-at-the-end-and-work-back/#more-29053, the defendant wrote and published:

> I think by now even our most casual readers know our successor website,
> **slabbed.org was knocked offline courtesy of the Times Picayune's** corporate parent
> **Advance Publications** and this started a chain of events that resulted in Slabbed
> temporarily being moved back to WordPress. I'd submit this was a miscalculation of
> gargantuan proportions for several reasons, which will become clear as I roll out this
> series of posts on Aaron Broussard's connections to Trout Point Lodge and its purported
> owners, Charles Leary, Danny Abel and Vaughn Perret. I say purported because others
> were sold 2% ownership interests in the Trout Point development as touted by Broussard
> and those folks are the bagholders in this deal.

51. The Plaintiffs say this publication is defamatory in that the defendant stated that the personal
Plaintiffs were not the owners of Trout Point Lodge, and that they were in fact the bag holders in
illicit deals involving Aaron Broussard. To be a bagholder or bagman is to be an illegal and false
front for illegal money collection or racketeering, a crime.

52. The defendant published the following in the same blog post, regarding a now-settled
proceeding in the Supreme Court of Nova Scotia involving one of Plaintiffs Leary & Perret's
former businesses: "Like I said one of the sticking points was the disclosure of the owners of La
Ferme D'Acadie, which Leary claims is the Dairy Farm portion of the Nova Scotia operations
and despite the fact Abel's name evidently appeared on the paperwork to get the loan Leary was
insistent Abel was not involved and the gyrations are simply stunning as we continue from the
court opinion:

> The applicant claims that broken pipes caused a flood in his home during the winter
> of 2002, resulting in the destruction of documents. In August 2005, Hurricane Katrina
> wiped out the office of Daniel G. Abel, who was Mr. Leary's Louisiana attorney and
> business associate. The applicant maintains that he kept records of the partnership's
> dealings with the plaintiff, as well as other business records, at this location. In the spring
> of 2006 a break-in at Trout Point Lodge in East Kemptville, NS, resulted in the theft of a

safe containing certain documents related to the transactions which are the subject of this proceeding.

Obviously there is a huge problem here – that of a liar or in this case a perjurer keeping his lies straight. Now maybe there was a bust pipe that took out vital records and maybe someone took time to drive to the middle of nowhere to steal the safe from a resort that was obviously not doing well financially. But Abel losing his records to Hurricane Katrina? Really Charles?

The judge did not appreciate Leary's arguments either and must have laughed him out of court."

53. Publishing that Leary lied to a justice of the Supreme Court of Nova Scotia, was laughed out of court, and committed perjury is defamatory. Perjury is a crime.

54. Publishing that Trout Point Lodge was not doing well financially is defamatory of the corporate plaintiff. Public reports of poor business performance would tend to lower the esteem of the corporate plaintiff in the eyes of a reasonable person.

55. On April 28, 2011, the defendant published on the topic of the personal plaintiffs' Costa Rica business Cerro Coyote, S.A. The defendant compared the personal plaintiffs and their business partners to the known criminal Bugsy Siegel and accused them of fraud. This publication is defamatory.

56. On June 1, 2011—after being served with a Notice of Intended Action—the defendant published a post entitled "From the reader mailbag: Nova Scotia, Paulsen v State Farm and Redflex."

57. In the above-named post, the defendant Handshoe as Sop81_1 published: "Question: What is going on in Nova Scotia?

Answer: Much of nothing good as business fell off drastically at chez girlz in 2010 when Aaron Br0ussard was forced from office in disgrace."

58. The Plaintiff says that publishing that the plaintiffs' business "fell off drastically" in 2010 is defamatory of the corporate plaintiff as well as the personal plaintiffs who are its day to day managers. Publishing that a fall off in business was somehow connected to Aaron Broussard being forced from his political position in disgrace is also defamatory in that it closely connects the plaintiffs, their business dealings and fortunes, with the Aaron Broussard scandal. This would tend to lower the esteem held for the plaintiffs in the eyes of reasonable persons.

59. In the same blog post, the defendant published the following as statements of fact:

The girls were the idea mongers in this equation but beyond Danny Abel in his heyday with
Wendell Gauthier they evidently had champaign [sic]tastes on a beer budget.  Broussard was
the hypester for the 3 ventures and he raised money from select members of the general public
to turn these ideas into bricks and mortar reality.  The plans were in reality hatched not born of
any sense of practicality as the market has passed judgement on the girl's plan and execution of it
and the verdict is not good.

60. Stating that the personal plaintiffs had Champagne taste on a beer budget is defamatory. It
impugned the business experience and acumen of the personal plaintiffs. The post also implied
that the sole reason the plaintiffs' businesses started and survived was due to Aaron Broussard
and his allegedly illicit activities. The post also stated that the market had looked unfavorably on
the plaintiffs and that the plaintiffs were not practical business people or professionals.

61. In the same blog post, the defendant published: "Perret left his momma in good hands though
as Danny Abel looked after her as a surrogate son after ol' Vaughn split years ago."

62. This publication is defamatory of plaintiff Perret as it implies that he abandoned his mother,
--"splitting"--leaving Louisiana for selfish purposes, and placed Daniel Abel as her surrogate
son.

63. On August 3, 2011, the defendant Handshoe published a blog post with the headline "I've just
been informed. ...."

64. In this publication, the blog post was "tagged" with the following, including hyperlinks:
Aaron Broussard, Atlantic Canada Opportunities Agency, Charles Leary, Danny Abel, Jefferson
Parish Political Corruption Scandal, La Ferme D'Acadie &. Charles Leary v. The Atlantic
Canada Opportunities, Trout Point Lodge, Vaughn Perret.

65. In this publication, the defendant Handshoe wrote about " **Trout Point Lodge** and its
connections to the Jefferson Parish Political Corruption Scandal."

66. The plaintiffs say that this publication is defamatory in that it further linked the plaintiffs
with alleged political corruption, including criminal acts. The Plaintiffs further say that the
defendant further implicated the plaintiffs in involvement with legal proceedings in Louisiana
with which the plaintiffs have no connection.

67. On August 15, 2011 in a post entitled "Actually Matt, you had this one called right to begin
with. Slabbed travels back in time with the girls and ties a few things together. A Trout Point
Lodge / Jefferson Parish Political Corruption Scandal Update Part 1," Defendant Handshoe again

linked and identified the plaintiffs with the Jefferson Parish political corruption scandal. This is defamatory.

68. In this post, Defendant Handshoe implicated the plaintiffs in "ordinary citizens losing their basic constitutional rights under the ruse of Tort Reform" including the "stripping" of ordinary citizens across this country of their constitutional rights." This is defamatory.

69. Defendant Handshoe identified Perret and Leary as members of the group he identifies in a derogatory way as "the girls." The Plaintiffs say that Handshoe linked "the girls" with "child molesting catholic [sic] priests," and with political corruption.

70. Defendant Handshoe wrote: "Abel was a good lawyer but his heart lay elsewhere in the world of cooking and hospitality and it is there he intersected with Charles Leary and Vaughn Perret as he funded their failed business ventures to his own financial detriment." This writing states that the plaintiffs business ventures were "failed" and that they were funded by their partner Daniel Abel to his detriment. This would tend to lower the esteem held by reasonable persons for the plaintiffs as business people and professionals.

71. On August 17, 2011 in a post entitled "Laissez les bons temps rouler! Slabbed travels back in time with the girls and ties a few things together. A Trout Point Lodge / Jefferson Parish Political Corruption Scandal Update Part 2," Defendant Handshoe wrote and published that "the girls work as a unit to grift their way through life." The personal plaintiffs were identified by Handshoe as part of this group. "To grift" is to obtain money or property illicitly. This is defamatory of the personal plaintiffs and accuses them of criminal activity.

72. In the same post, Handshoe wrote: "shape shifting is common for the girls as the reported ownership of the Trout Point Lodge and Dairy Farm has also magically morphed through time as we'll explore in a later post." Defendant Handshoe continued to write about "the trail of scams and political corruption that leads to Nova Scotia and Trout Point Lodge." This is defamatory.

73. On August 18, 2001 Defendant Handshoe published a post entitled: "First class bitches, common thugs or plain ol' morons: The Girls at Trout Point Lodge sue Fox 8 and Slabbed. A Trout Point Lodge /Jefferson Parish Political Corruption Scandal Update." This is defamatory in that it refers to the plaintiffs as "first-class bitches," "common thugs," and/or morons and it links the plaintiffs to and identifies them as part of the Jefferson Parish political corruption scandal. It also attempts to link slabbed and the television station Fox 8 WVUE as though slabbed were equivalent to a news media organization.

74. Handshoe referred to the plaintiffs as the "litigitious [sic] bunch at Team Girls/Trout Point." This is defamatory. To be litigious would tend to lower the esteem reasonable people would hold for the plaintiffs.

75. Handshoe wrote: "Later I will post an official statement from Slabbed New Media LLC and put up a new page titled "So You Want to Sue Slabbed" which will give some elemental instruction on how to properly execute service of process etc. Click the pic to get the latest screed from the girls while I prepare the next installment connecting Trout Point Lodge to the Jefferson Parish Political Corrutpion Scandal. ~ sop." This is defamatory.

76. Defendant Hanshoe on or around August 18, 2011 published on the slabbed blog a page entitled "So you want to sue slabbed." Here he referred to "an elite fraternity of crooks, miscreants and various and sundry other individuals I've managed to piss off writing this investigative blog." The Plaintiff say that this statement refers to the plaintiffs and is defamatory.

77. In an August 19, 2011 comment connected to the above post Defendant Boudreaux referred to the personal plaintiffs as "douche-bags." This is defamatory.

78. Defendant Boudreaux also referred to this legal action as foolish and frivolous. This is defamatory.

79. On August 25, 2011 Defendant Handshoe published a "comment" from "Novell Ecosse." It read: "Please whack me upside the head with an obvious stick, Three men register a business and borrow money to develop and market said business. Once money is in the till, they dissolve the business and don't tell the lender. Sounds like fraud to me. Then two start up a new business and the new name gets all the marketing and promotion the money for the dissolved business received." The Plaintiffs say that this comment refers to the plaintiffs. It is defamatory and accuses the plaintiffs of involvement in fraud, a crime.

80. On August 24, 2011, Defendant Handshoe published material entitled: "The problem with lying is keeping all of them straight. A Jefferson Parish Political Corruption / Trout Point Lodge Scandal Update Part 3." This is defamatory. It accuses the plaintiffs of lying in public and identifies them with the Jefferson Parish scandal.

81. In this post, Defendant Handshoe wrote:

> There is no doubt the timing of **Rich Rainey's series of articles on Trout Point Lodge and Aaron Broussard's connections thereto** could not have come at a more

inopportune time for the three owners of the lodge, Danny Abel, Charles Leary and Vaughn Perret. While Rainey focuses his articles on the curious Nova Scotia connection involving Broussard and the complaint to the Louisiana Ethics Commission, Rainey's articles contained some damning evidence of potential wrongdoing involving Leary and Perret in Canada and it had nothing to do with Broussard per se. In fact I'd submit to this day neither Rich Rainey or his employer know real reason why Leary and Perret went postal on them after his story on Trout Point appeared in January, 2010 but that changes today.

82. This is defamatory in a number of respects. It states that January, 2010 publications of the Times-Picayune newspaper came at an inopportune time for the plaintiffs, implying that the plaintiffs were secretly getting away with illegal or illicit activity that was uncovered by the newspaper at a bad time. It states that the newspaper articles contained damning evidence about the plaintiffs' wrongdoing. This is defamatory and also makes no reference to the newspaper's published retractions, thereby misguiding readers with wanton disregard for the truth. The Defendant Handshoe stated that the plaintiffs "went postal," implying that they had a violent and irrational overreaction to publications about them. This is defamatory.

83. Defendant Handshoe continued to write: "the subject of ownership in the various girly business ventures is a touchy subject with Team Trout Point." This is defamatory and continued the innuendo of coverup or mystery established by the defendants in earlier publications.

84. Handshoe writes that plaintiff Perret and his business partner Abel "are dodging service of process." This is defamatory.

85. Handshoe writes that "The dispute was the crash and burn of the Nova Scotia boutique farm and rolling over some of the money into Trout Point." This is defamatory of all plaintiffs.

86. Defendant Handshoe wrote: "At this point Leary has lost at every point of the proceedings in Nova Scotia." and "He was compelled to disclose the names of the owners in La Ferme d'Acadie and produce records in the Canadian equivalent of discovery." These statement are defamatory. Defendant Handshoe's publications made no reference to the May, 2010 settlement and discontinuance in the referenced litigation, part of the public record accessible to him, of which he was aware or would have been aware had he conducted the most basic of inquiries. The Defendant's publications imply that the plaintiffs were in August, 2011 still in active litigation with the Atlantic Canada Opportunities Agency. This is defamatory. Defendant Handshoe's

publications on the consequences of decisions of the Supreme Court of Nova Scotia and the Nova Scotia Court of Appeal are incorrect. Stating that Plaintiff Leary was compelled to do things he was not compelled to do is defamatory. In all, Handshoe creates a defamatory innuendo regarding Nova Scotia court proceeding involving the plaintiffs, portraying them as fraudsters, obstructionists, litigious, and unprofessional. This is defamatory.

87. Defendant Handshoe continued to write: "The problem here is lots of inconsistency in the public record but inconsistency is the only constant with the girls." This is defamatory and again imputes that the plaintiffs have misled others.

88. Defendant Handshoe republished a portion of a New Orleans Times-Picayune article, which continues the innuendo that the plaintiffs were involved in Jefferson Parish political corruption, federal felons, and shady dealings. This is defamatory republication of retracted material for which the plaintiffs hold Defendant Handshoe responsible.

89. Handshoe wrote: "in reality Rainey was 100% factually correct in his reporting." This is defamatory, taking retracted material referring to the plaintiffs and labeling it as factual. Handshoe then again implies Plainitff Leary committed perjury. This is defamatory.

90. Handshoe continues in the same post to write about Plaintiff Leary's "dishonesty inherent to his dealings with the Nova Scotia court system." This is defamatory.

91. Also during April, 2011, the defendant Handshoe published the following comment by "Unslabbed" (Boudreaux) on more than one occasion:

> "Oh my , what a tangled web we weave when first we endeavor to deceive.
>
> Welcome to Slabbed Danny and Carlie and Charlie and Vaughnie and any of you other Special Guys of Trout Point and Wild West.
>
> Now I am VERY curious and inquisitive about you…and ALL your BUDS.
>
> May I suggest BOYS that you all huddle quickly and decide if the Inquisition sure to follow continued attempts to GAG the Slabbed Nation is worth the information which will be elicted [sic] in protracted legal battles on all continents. Please remember that many of us enjoy Dual Nationalities, Counsulate [sic] Immunities, and have LONG REACHING tentacles … perhaps longer than yours , although size is not really that important unless you are on the receiving end.
>
> If I were you BOYS I would keep my head down, not bend over to pick up the soap and ride my horses into the sunset on Brokeback Mountain.

I, one Slabbed Nation member, vow to search you all out to the ends of the earth ( Yes in Switzerland, Hawaii, France, Italy, Canada and Spain ) anywhere any of you have any connections.

I have the time, temperament and now the impetus to set myself to this task. Hold on, it may be a bumpy ride for some of you.

See ya soon, Cowboys.

92. The Plaintiffs say that this publication is a threat and is replete with anti-gay and homophobic rhetoric and innuendo. It is defamatory in that it states that the plaintiffs endeavor to deceive third parties and the general public about their business activities and personal lives, something that would lower the esteem reasonable persons would hold for the plaintiffs.

93. The Plaintiffs say that the defendants acted with express malice in making their publications.

94. In particular, the Defendant Handshoe blamed the Plaintiffs for causing him to loose the host for his new web site with the url slabbed.org. The Plaintiffs say that the series of posts published by the defendant are intended as revenge, motivated by malice.

95. In late August, 2011, defendant Handshoe admitted in an interview with Andrew Speller of Frank magazine that he had been "screwing with" the plaintiffs through his blog. "Screwing with" the plaintiffs indicates malice. He also admitted having been given notice of intended action, and to having published the text of court documents commencing the action against him on slabbed.

96. On August 30, 2011, Defendant Handshoe authored and published a post entitled: "About the chances that Trout Point Lodge will be bankrupt within a year….."

97. Defendant Handshoe wrote: "Obviously the girls at Trout Point Lodge do not have a stellar business record folks from their failed Washington Parish Exotic Cheese Farm to the defunct Nova Scotia Dairy farm to the ill fated Cerro Coyote Hotel project, all of which were at least partially paid for with other people's money. After Aaron Broussard's fall from grace and the end of pay to play Nova Scotia style things just got plain worser for the girls at Trout Point who tried everything, from marketing the lodge as gay friendly to rolling out all the PR stops."

98. The above publication is defamatory and impugned the business performance of the plaintiffs since 1990. It also ties the plaintiffs business success to monies flowing from political corruption involving Aaron Broussard. It imputes that third parties paid for the plaintiffs business holdings. These sentences combined with the title are intentionally and maliciously designed to

damage the plaintiff's reputation.

99. Defendant Handshoe wrote: "the lodge, which is stuck out in the middle of no where. " This is defamatory, a statement of fact that would lower the plaintiff Trout Point Lodge's esteem in the eyes of reasonable persons reading Handshoe's publication.

100.    Defendant Handshoe states that the Plaintiff Trout Point Lodge advertises heavily on TripAdvisor. This is defamatory, and untrue, designed to make it appear as though the plaintiff is in dire economic straights and has resorted to drastic measures to advertise.

101.    Defendant Handshoe further states: "The real score is it appears Leary and his blowbuddy Vaughn Perret are so paranoid they're willing to piss off members of the media in order to maintain the illusion of editorial control about what is written about their business ventures, especially the scams and the ones that didn't work out.

As always Slabbed reports you decide and stay tuned because we'll have more on the girls at Trout Point and their nefarious business practices.

sop"

102.    This is defamatory in that it refers to the plaintiffs business practices as nefarious. Nefarious means flagrantly wicked. To say that the personal plaintiffs are paranoid is defamatory, as is the statement that they anger "members of the media." To call the plaintiffs "blowbuddies" is a further example of the defendants use of discriminatory remarks targeted at perceived homosexuals.

103.    On August 31, 2011 a comment from "Kidd" published by Handshoe stated of the personal plaintiffs: "Damn! Queer (as in goofy as hell) fag (as in deviant perverts) scum (as in lawyers): again, queer fag scum!" This is defamatory.

104.    The Plaintiffs further say that both Defendants were malicious in their writings and publications based on discriminatory, hateful, anti-gay attitudes.  In these publications, the defendants exhibit hatred and contempt for gay people.

105.    The Plaintiffs also say that the defendant created an innuendo of "cover-up," mystery, and grandiosity to events surrounding retractions published by the Times-Picayune newspaper as well as the plaintiffs' business activities.

106.    On April 27, 2011, the defendant wrote: "And then one week and a day ago things changed with this Trout Point thing rearing its ugly head."

107.    On April 20, 2011, the defendant wrote: "It's never 'the crime' but the coverup that often

lands people in hot water.  The powers that be hung reporter Rich Rainey out to dry on his reports on Trout Point Lodge." On April 18, 2011, the defendant published that "the Times Picayune tried to shut us down." In another "comment" blog post, the defendant published: "Left with little choice I agreed to delete the content on Slabbed.org so I can get control of my blog back. I will not be deleting the content here and in fact we're going to examine not only the retracted story in detail but the players involved including Danny Abel, Charles Leary, Vaughn Peret and their Trout Point Lodge. . . . The Times Picayune rolled over and played dead on this. We're not."

108.    The defendant Handshoe continued: "if the T-P wants a war I gotta be able to fight it without worrying if my web host will pull the rug out from under me."

109.    On April 28, 2011, the defendant Handshoe published: "Bit by bit and slice by slice I'm determined to reveal the truth behind Trout Point. Rich Rainey would have but his employer is a pussy."

110.    On June 21, 2011 Handshoe published the further threatening headline: "Trout Point here we come. ..."

111.    The defendants created the innuendo that there was a grandiose coverup involving the plaintiffs, a major daily newspaper, and its law firm, which consisted of "a war" against the defendants and the silencing of investigative reporter Richard Rainey, among others. The defendants created the innuendo that the plaintiffs were involved with "the powers that be" in an effort to "gag" the defendants' publications.

112.    The defendant Handshoe was under the impression and conveyed to readers that he was part of the "News Media."

113.    The defendants' publications were replete with inaccuracies and an apparent inattention to basic ethics and duties to check facts before publishing.

114.    The defendants never contacted the plaintiffs for information before any of their repeated Internet publications about the plaintiffs, which extended from January, 2010 to at least August, 2011 and were all in continuous publication.

115.    The false statements set forth in the defendants' publications exposed the plaintiffs to public contempt, ridicule, aversion and disgrace, and induced an evil opinion of the plaintiffs in the minds of right-thinking persons and deprived the plaintiffs of their friendly intercourse in and commerce with society.

116.    In their writing and publishing activities the defendants acted and continue to act in a reckless and malicious manner without due consideration for the standards of information gathering and dissemination ordinarily followed by responsible writers, editors, and publishers. The Defendants practiced a total disregard of the consequences, and acted without caring whether the content that they published around the world was true or false. This was malicious conduct arising from the Defendants not having made easily-accomplished & reasonable inquiries into the truth about the Plaintiffs, from unsubstantiated conspiracy theories about "the powers that be," and from an intentional refusal to give weight to retractions of previous news media reports. The means or sources to discover the truth were readily available to the Defendants. Alternatively, the Defendants deliberately refrained from making any inquiry whatever.

117.    The Plaintiffs state that at all relevant times they were not subjects of public interest.

118.    Allegations, imputations, and innuendo created by the Defendants about the Plaintiffs were serious, involving allegations of illicit, unethical and clearly criminal activities. There was no urgency in making publication. The Defendants did not identify sources or use reliable sources, or if its sources were reliable, the defendants did not take due care in representing what those sources actually said. The defendants published anonymously and intentionally allowed others to do so. The Defendants did not fairly represent the Plaintiffs' side of the story. The various defamatory statements, imputations, representations, and innuendo were unjustified and unjustifiable.

119.    The defamatory publications never indicated, expressly or implicitly, that words published as truths had not been verified.

120.    The Plaintiffs are entitled to punitive & exemplary damages for defamation in an amount to be determined.

### Invasion of Privacy; Conspiracy to Invade Privacy

121.    The personal plaintiffs do not know the defendants and have never had contact with them, except for hiring someone to serve process on them in the context of this action.

122.    The personal plaintiffs are not public figures and lead private lives. The fact that the personal plaintiffs are gay, have made previous claims of discrimination based on their sexual orientation, or advertise Trout Point Lodge as a gay-owned business, did not invite the defendants or others into the realm of their personal lives or their bedrooms.

123.    The Plaintiffs say that Defendant Handshoe's repeated statements that because the plaintiffs publicly advertised their business as gay-owned, that therefore they should be barred from claiming discrimination —because they have already said that they are "queer," to use language approved and published by Defendant Handshoe--is non-sensical except to a bigot. Identifying oneself as gay does not, in Canadian society, allow the defendants to invade the plaintiffs privacy or conspire with others to do so.

124.    The defendants actions beyond their defamatory publications have harmed the personal plaintiff's dignity interests and personal autonomy; they have also experienced embarrassment and mental distress due to the defendants' action. The damages claimed do not depend upon publication or publicity issues described above as defamatory.

125.    In particular, the defendants' conduct based on the plaintiffs' sexual orientation is an invasion of privacy. The sexual orientation of the plaintiffs is a private matter. What the plaintiffs do or do not do in their bedroom is a private matter. The defendants have violently and flagrantly damaged the privacy interests of the plaintiffs. This invasion of privacy goes beyond publicly referring to someone as gay or homosexual—which may or may not be defamatory—and extends into the realm of illegally exposing the private lives of the plaintiffs, including their sexual preferences, personal history, business & life decisions, alleged credit worthiness, place of residence, and national origin as separate and apart from any defamatory publications.

126.    In addition, the plaintiffs say the defendants have conspired amongst themselves and with others to invade the plaintiffs' privacy, and have used inter-state and international means of communication to so conspire.

127.    The conspiracy occurred outside the bounds of making any defamatory publications listed above.

128.    The Plaintiffs say that all any reasonable person has to do in order to understand the invasion of privacy in this action is to substitute racial or religious epithets for the homophobic remarks, attitudes, and stereotypes of the defendants.

129.    The Plaintiffs say that identifying oneself as gay, or identifying one's business as gay-owned is not a license for invasion of privacy or a conspiracy to do so.


## Tortious Interference with Contractual Relations; Tortious Interference with Economic Relations; Injurious Falsehood

130.   The Plaintiffs re-aver the paragraphs above and say that the defendants, motivated by admitted malice, intentionally published the defamatory statements above, which are falsehoods, in an attempt to injure the plaintiffs' businesses and their rightful commerce with society.

131.   The Plaintiffs also re-aver the paragraphs above and say that the defendants intentionally interfered with the plaintiffs' existing contractual relationships.

132.   In particular, the plaintiffs say that the defendants intentionally interfered with agreements the plaintiffs had entered into with the Atlantic Canada Opportunities Agency (ACOA) and with the defendants in Supreme Court of Nova Scotia case number Yar 328248 (2010), including the Times-Picayune newspaper. The Defendants thereby interfered with a discontinuance in the ACOA action and a consent order filed with the Supreme Court of Nova Scotia in Yar No 328248, re-igniting the content of disputes settled by mutual agreement and undoing, at least in part, the effect of a published retraction.

133.   The Plaintiffs further say that the defendants have caused actual damage to the plaintiffs' other contractual relationships in numerous ways, including: causing those with existing reservations to cancel those reservations and causing valued & experienced employees of the plaintiffs to re-evaluate their employment and future employment possibilities in ways damaging to the plaintiffs.

134.   Relatedly, as injurious falsehoods, the Plaintiffs say that Defendant Handshoe has intentionally or recklessly, with wanton disregard for the truth, misrepresented Leary & Perret's past dispute with the Atlantic Canada Opportunities Agency, as well as their counterclaims against said Agency. Publications about the ACOA litigation constitute a new area of innuendo and imputation designed to cause the plaintiffs injurious consequences in their home province. Falsehoods include statements and imputations that ACOA funds were misused and/or fraudulently misdirected to Trout Point Lodge. Not only is this untrue, it was never one of ACOA's claims.

135.   The Plaintiffs say that Defendant practiced misrepresentation with such wanton disregard to the facts that such misrepresentation was itself a falsehood.

136.   Another falsehood is that the registered ownership of partnerships and corporations in Nova Scotia changed through time in an illicit, criminal, or mysterious manner. This is untrue and was never one of ACOA's claims in its law suit.

137.   That Plaintiff Leary perjured himself is false and utterly maliciously-motivated.

138.  Defendant Handshoe intentionally and with malice misrepresented the published record of the ACOA matter, and portrayed events in an entirely distorted and untruthful way. He never stated that the matter was amicably settled, which is the truth.

139.  Defendant Handshoe's assertion that the ACOA litigation was ongoing in August, 2011 and that the plaintiffs had lost everything thus far in that proceeding was untrue. Handshoe intentionally failed to note Plaintiff Leary's winning of a "production order" directed at ACOA from a judge of the Supreme Court of Nova Scotia, and a decision from the Nova Scotia Court of Appeal that the lower courts "Disclosure Order be set aside in total to the effect that ACOA cannot rely on it to obtain any information from the appellants and the appellants may proceed to prosecute their crossclaim."

140.  Defendant Handshoe also failed to note the Court of Appeal published decision, the final piece of the public record of this case before amicable settlement, which stated of Appellant Leary and his claims:

> [22]    One can understand the appellants' exasperation and confusion with the way in which this case has unfolded. The record here is not stellar. At the hearing counsel for ACOA admitted that the process and progress to date has been "abysmal". I need not particularize its shortcomings in order to deal with what I see as the principal and narrow issues on appeal. Dr. Leary's excellent submissions make it clear that the appellants' complaints are hardly frivolous and deserve a hearing. However, the issues raised in their defence and counterclaim are matters to be determined at trial, where the evidence from both sides can be tested in the crucible of cross-examination on the witness stand. Our disposition of this appeal will clear away the procedural debris so that the parties may pursue their litigation, with dispatch.

141.  The Plaintiffs re-aver all the paragraphs above and state that the maliciously-motivated defendants intentionally sought to interfere with the plaintiffs' economic relations and have successfully done so, to the plaintiffs' detriment and monetary disadvantage.

142.  In particular, the defendants intentionally sought to cause those persons once desirous of custom with the plaintiffs to forego that custom. In addition, the defendants caused and excited persons in Nova Scotia to have a hateful attitude towards the plaintiffs and to act on those hateful feelings, causing the plaintiffs direct damage as well as damage to their non-contractual relationships with employees, friends, and neighbors.

143.   Finally, the defendants lied about the plaintiffs motivated by a desire to damage their commerce and intercourse with society.

144.   The defendants were successful in damaging the plaintiffs' custom and ability to attract investment from third parties for future projects.

145.   The defendants  freely accessible Internet publications with their repeated use of the phrases "Trout Point Lodge" and "Nova Scotia" and the "tags" on the blog posts were intentionally designed to damage the plaintiffs' reputation on the Internet and ranking on search engines, and to ensure that the defendants' injurious statements appeared prominently in search engine queries about or related to Trout Point Lodge. This damaged the plaintiffs and their ability to attract custom, particularly as the Plaintiffs Trout Point Lodge depends on the Internet for a majority of its business.

146.   In particular, the defendants' injuriously false blog posts appeared prominently on search queries related to Trout Point Lodge in search engines such as Google and Yahoo.

### Intentional Infliction of Emotional or Mental Distress; Assault

147.   The Defendants' blog postings were flagrant and outrageous conduct that was calculated by Defendant Handshoe to personally harm the plaintiffs Leary, Perret, and their close associates.

148.   The plaintiffs say that Leary & Perret had previously been the victim of threats, harassment, hate speech, trespass, and property damage while rural Louisiana residents based on their perceived sexual orientation. At one point a field at their Louisiana farm, near their residence, was set ablaze and the local fire department and Sheriff's office refused to respond and in contravention of the law failed to keep record of "911" calls. This incident and others were reported to the Federal Bureau of Investigation in 1996.

149.   Leary & Perret moved to Canada and started the Trout Point Lodge business precisely to avoid and distance themselves from such a hateful and discriminatory environment.

150.   Between April and August, 2011, Perret and Leary experienced anxiety, added stress, and sleeplessness as a result of the defendant's publications. Perret and Leary experienced physical symptoms of stress, for which he had to take medication.

151.   The plaintiffs say that both defendants intentionally created in plaintiffs Leary & Perret the apprehension of imminent harmful or offensive contact.

152.   On August 3, 2011, Defendant Handshoe published that: "the newest chapter of the Slabbed Nation has been formed in Nova Scotia."

153.    Plaintiffs Leary & Perret had and have a genuine fear of being physically interfered with after reading the defendant's publications. Leary & Perret believed that contact with the defendant or persons intentionally encouraged by the defendant was potentially imminent.

154.    The Plaintiffs operate an accommodation and foodservice enterprise that must remain open to the public at large for their livelihood. Security is difficult given the necessity of remaining receptive to the general public. The personal plaintiffs work personally every day in the business.

155.    The defendant repeatedly threatened physical contact and vengeance. In particular, the defendant referred to himself as a "ballbuster." The defendant wrote and published the bold-faced phrase "It's on" above an Arnold Schwartzenger "Terminator" movie clip, while referring to the plaintiffs. The defendant posted video clips with names such as "killing me softly," Terminator II, and "burning down the house," as well as biblical references to Ezekial 25:17, with its talk of vengeance, with audio taken from the violent movie "Pulp Fiction," and to the violent, vengeful acts depicted in a violent Bruce Willis motion picture with the caption "Yippi Ki Yay Motherfucker."

156.    The Unslabbed post quoted above directly advised each plaintiff to "keep his head down," threatened to "search him out to the ends of the earth," that it may be a "bumpy ride," and that Unslabbed, a member of the "Slabbed Nation," would "see you soon."

157.    Combined with the hate speech, homophobic, and anti-gay rhetoric and innuendo of the defendant's publications, Leary and Perret feared imminent contact and harm from obviously mentally unstable individuals from the deep south of the United States.

158.    Plaintiff Leary contacted the Federal Bureau of Investigation, the Human Rights Commission of Canada, the Nova Scotia Human Rights Council, the Royal Canadian Mounted Police (Yarmouth Rural Detachment), and the Internet Crime Complaint Center upon reading Unslabbed's (defendant Boudreaux's) publication on the defendant's slabbed blog.

159.    The Plaintiffs seek general, special, as well as exemplary and punitive damages plus costs.


PLACE OF TRIAL: YARMOUTH, YARMOUTH COUNTY, NOVA SCOTIA


DATED at Kemptville, Nova Scotia  this ⎽14⎽th day of ~~August~~ September, A.D., 2011.

_____

Charles Leary representing himself
and Trout Point Lodge as agent &
officer

_____

Vaughn Perret representing himself
and Trout Point Lodge as agent &
officer

TO: The Prothonotary, Supreme Court of Nova Scotia, Yarmouth, NS

TO: The Defendant